**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TRESSA JORDAN, INDIVIDUALLY AND AS LEGAL GUARDIAN OF BABY A.J. AND BABY L.J.**

**Plaintiff,**

**v.**

**MDL No. 2804**
**Judge Dan Aaron Polster**
**Civil Action No.:________________**

**JURY TRIAL DEMANDED**

**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**MYLAN PHARMACEUTICALS, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC;**
**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.;**
**DEPOMED, INC.;**
**PAR PHARMACEUTICAL, INC.;**
**PAR PHARMACEUTICAL COMPANIES, INC.;**
**NORAMCO, INC.;**
**INDIVIOR, INC.;**
**CVS HEALTH CORPORATION;**
**WALGREENS BOOTS ALLIANCE, INC.;**
**WALGREEN EASTERN CO.;**
**WALGREEN CO.;**
**WAL-MART INC. f/k/a WALMART STORES, INC.;**
**H.D. SMITH, LLC;**
**H.D. SMITH HOLDINGS, LLC; and**
**H.D. SMITH HOLDING COMPANY,**

**Defendants.**

## COMPLAINT

**NOW COMES** Plaintiff, Tressa Jordan, individually and as Legal Guardian of Baby A.J. and Baby L.J., (hereinafter "Plaintiffs" or "Baby Plaintiffs") and hereby files their Complaint against the Defendants for damages. In support thereof, Plaintiff states as follows:

## JURISDICTION AND VENUE

1. This Court is vested with jurisdiction by virtue of the parties' diversity, 28 U.S.C. § 1332. Minimal diversity exists between Defendants and Baby Plaintiffs, are residents of the State of Missouri. The amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over Defendants, each of which has committed one or more actions alleged in this Complaint within the State of Missouri. Moreover, Defendants have substantial contacts and business dealings directly within Missouri by virtue of their distribution, dispensing, and sales of prescription opioids.

3. Plaintiffs rely on CMO 1 that this case will be transferred to the appropriate court, and Plaintiffs reserve the right to move for transfer to the U.S. District Court for the Eastern District of Missouri at the conclusion of pretrial proceedings. Plaintiffs assert that Kansas law applies based on the situs of injury

## PARTIES

### A. Plaintiff

4. Tressa Jordan is a resident of Independence, Missouri in Jackson County. She is the biological mother and legal guardian of Baby A.J. born on May 26, 2013 and Baby L.J. born on July 24, 2014. Both Baby Plaintiffs were born at Olathe Medical Center in Olathe, Kansas, and they were both exposed to opioids in utero as a result of their biological mother's opioid prescriptions. Tressa Jordan, as the legal guardian of Baby A.J. and Baby L.J., has the duty to care for her children and to provide all of their needs arising from their injuries sustained due to their exposure to opioids in

utero.

5. As a result of their prenatal exposure to opioids in utero ("POE"), Baby Plaintiffs suffered from a condition referred to as Neonatal Abstinence Syndrome ("NAS"), also known as Neonatal Opioid Withdrawal Syndrome ("NOWS"). As a consequence of their prenatal opioid exposure, Baby Plaintiffs have severe permanent disability and damages to his mind and body. For example, ADHD, Social and Behavioral Issues, Cognitive Delays, and Developmental Delays. Similarly, Baby A.J. experiences Club Feet, Hearing Problems, Heart Defects, Gastrointestinal Problems, Respiratory Problems, ADHD, Speech Delays, Social and behavioral Issues, Cognitive Delays and Developmental Delays.

**B. Defendants**

***Manufacturing Defendants***

6. Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "**Endo**.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Kansas. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Kansas, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

7. Indivior, Inc. ("**Indivior**") is a Delaware domestic corporation with its principal place of business in Richmond, Virginia. Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior, Inc. is a subsidiary of Indivior, PLC, based in the United Kingdom. Indivior,

Inc. was formerly known as Reckitt Benckiser Pharmaceuticals, Inc. Indivior, Inc. has manufactured and/or labeled buprenorphine shipped to Kansas at all times material.

8. Mylan Pharmaceuticals, Inc. ("**Mylan**") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan manufactures, promotes, sells, and distributes opioids in the U.S. and Kansas at all times material.

9. Cephalon, Inc. ("**Cephalon**") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Kansas at all times material.

10. Teva Pharmaceuticals USA, Inc. ("**Teva USA**") is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011. Teva USA and Cephalon collaborate to market and sell Cephalon products in the U.S and in Kansas at all times material.

11. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson ("**J&J**"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "**Janssen.**"). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Kansas at

all times material.

12. Noramco, Inc. ("**Noramco**") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. Until 2016, Noramco wholly owned Tasmanian Alkaloids, Inc., the largest opium poppy producer in the state of Tasmania, Australia. During Noramco's ownership of Tasmanian Alkaloids, Noramco processed and imported Active Pharmaceutical Ingredients ("APIs") necessary for the production of opioid drugs to the United States and sold these APIs to Janssen and various other domestic opioid manufacturers.

13. Allergan PLC ("**Allergan**") is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan PLC, which uses them to market and sell its drugs in Kansas at all times material.

14. Depomed, Inc. ("**Depomed**") is a California corporation with its principal place of business in Newark, California. Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Depomed develops, markets, and sells prescription drugs in Kansas at all times material.

15. Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "**Par Pharmaceutical**"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("**EHS**") and Endo Pharmaceuticals, Inc. ("**EPI**). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "**Endo**"), manufacture opioids sold throughout the United States including in Kansas at all times material.

16. Endo, Indivior, Mylan, Cephalon, Teva, Janssen, Noramco, Actavis, Depomed, and Par Pharmaceutical, are collectively referred to hereinafter as the "**Manufacturing Defendants**."

***Distributor Defendants***

17. CVS Health Corporation ("**CVS**") is a Delaware corporation with its principal place of business in Rhode Island. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores in numerous states, including in Kansas, that sell prescription medicines, including opioids. At all times relevant to this Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Kansas, at all times material.

18. McKesson Corporation ("**McKesson**") has its principal place of business in Irving, TX and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the State of Kasnas.

19. Cardinal Health, Inc. ("**Cardinal**") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial

amounts of prescription opioids to providers and retailers in the State of Kansas.

20. AmerisourceBergen Corporation ("**AmerisourceBergen**") has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the State of Kansas.

21. Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois. Defendant Walgreen Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores. Together, Walgreens Boots Alliance, Inc., Walgreen Eastern Co., and Walgreen Co. are referred to as "**Walgreens**." Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities serving the state of Kansas.

22. Wal-Mart Inc. f/k/a Walmart Stores, Inc. ("**Wal-Mart**"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Kansas.

23. H. D. Smith, LLC d/b/a HD Smith f/k/a H. D. Smith Wholesale Drug Co., H. D. Smith Holdings, LLC, H. D. Smith Holding Company ("**H. D. Smith**") is a Delaware corporation with its principal place of business in Springfield, Illinois. H. D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States,

including Kansas.

24. McKesson, Cardinal, AmerisourceBergen, CVS, Walgreens, Wal-Mart, and H.D. Smith, are collectively referred to hereinafter as "**Distributor Defendants**."

## A GENERATION OF DAMAGED CHILDREN FROM IN UTERO OPIOID EXPOSURE

25. Baby Plaintiffs and their mother are victims of the opioid crisis that has ravaged Kansas, causing immense suffering to those born addicted to or dependent upon opioids and great expense to those forced to deal with the aftermath. The number of infants born suffering from this insidious condition is staggering.

26. Like thousands of children born every year, Baby Plaintiffs were born dependent on opioids. Prenatal exposure to opioids in utero causes severe withdrawal symptoms, teratogenic defects, and lasting developmental impacts. The first days of Baby Plaintiffs life were spent in excruciating pain as they weaned from opioid dependency. They will require years of treatment and counseling to deal with the effects of his prenatal exposure.

27. Baby Plaintiffs' biological mother was prescribed Defendants' opioids prior to her pregnancy, which led to her opioid dependency and addictions, resulting in Baby Plaintiffs' opioid exposure during gestation.

28. Baby Plaintiffs were diagnosed with Neonatal Abstinence Syndrome ("NAS"), arising from his biological mother's use of opioids during pregnancy. NAS is a consequence of the abrupt discontinuation of chronic fetal exposure to opioids that were used by the mother during pregnancy.

29. Baby Plaintiffs' biological mother consumed opioids manufactured and distributed by one or more of the Defendants before her pregnancy or during her pregnancy with Baby Plaintiffs.

30. Defendants misrepresented the efficacy and safety of their products to the point that it caused addiction. Defendants repeatedly violated the Controlled Substances Act. Defendants failed to alert the authorities about questionable orders and abuses, and they failed to take action to avoid

the adverse consequences of those orders and abuses.

31. Defendants failed to disclose the negative health impacts known to them, including teratogenic and mutagenic effects, in their marketing materials, package inserts, label warnings, unbranded research, captive advocacy group communications, FDA applications, FDA filings or any other means of communication.

32. Defendants failed to disclose that opioids in utero affect the development of the fetal brain. It is likely that a child so exposed experiences DNA changes at the cellular level, particularly in the tissues of the brain and nervous system and suffer lifelong affliction.

33. Defendants failed to disclose that in utero exposure to opioids causes a generalized multi-system disorder that produces a constellation of symptoms.

34. Defendants failed to disclose that the use of opioids in pregnant mothers and neonates is associated with a plethora of negative health impacts including, but not limited to, reduced brain and somatic growth, intractable nystagmus, altered visual evoked potentials, delayed encephalopathy, respiratory depression, bradycardia, hypotension, urinary retention, and reduced gut motility and emesis.

35. Defendants failed to disclose that other major risks from in utero opioid exposure are defects at birth including altered brain development, muscular-skeletal system deficiencies, digestive system deficiencies, cardio-vascular system deficiencies and nervous system deficiencies.

36. Defendants failed to disclose that these children often require extensive care because they are likely to experience lifelong mental health problems and disorders, developmental impairment and cognitive defects, and physical health limitations and disorders.

37. Defendants failed to disclose that children with NAS diagnoses are at increased risk for neuropsychological dysfunction and that children exposed to opioids in utero are at a substantially higher risk for lower mental abilities and for attention deficits, and that these effects will persist or

worsen through adolescence.

38. Cognitive development is impaired in children exposed to opioids in utero. Opioid exposure causes them to face a significantly increased risk of mental, speech/language and emotional disorders Specifically, children diagnosed with NAS, including Baby Plaintiffs, exhibit or will exhibit:

a. By age 1: diminished performance on the Psychomotor Development Index, growth retardation, poor fine motor skills, short attention span, and diminished intellectual performance;

b. Between ages 2-3: significantly lower cognitive abilities, including lower motor development, lower IQ, and poor language development;

c. Between ages 3-6: significant detrimental impact on self-regulation, including aggressiveness, hyperactivity, lack of concentration, lack of social inhibition, lower IQs (8-15 point difference), poor language development, and behavioral and school problems;

These damages, symptoms and dysfunctions then progress with age.

## DEFENDANTS ENTERED INTO A DECEITFUL SCHEME TO EXPAND THE DEMAND FOR OPIOIDS

39. Defendants had an insidious plan to maximize profits. They had to overcome the constraints imposed by the amount of medically necessary opioids that could be sold through controlled channels. The Defendants caused the change in the criteria that were to be applied by a physician to deem the treatment by opioids to be medically necessary. The Defendants had to expand the criteria so that it would allow opioids to be prescribed to patients beyond just for breakthrough pain. The Defendants realized that the number of cancer patients would not likely increase drastically from one year to the next, but if the indications for use of a particular drug could be expanded, then it could boost sales exponentially without any real change in the country's health demography. Thus patients like Plaintiffs biological mother were opioids for long term treatment of non-cancerous

conditions like scoliosis.

40. Once exposed to the opioids with addictive properties, users of the opioids could easily transition into the secondary market, which was necessarily supplied from the primary market, which Defendants were legally charged with ensuring there was no supply for. The Defendants knew that the demand from the secondary market created a pill mill industry that drove prescriptions written for the primary market.

41. Manufacturing Defendants' quest to open a new primary market for opioid prescriptions led to opioid treatment of chronic, widespread pain without dose limits. The Manufacturing Defendants convinced physicians to write prescriptions into this new market that would ensure through the insidious mechanism of addiction that patients, including Kansas women of child-bearing age, would have to keep coming back for more. With the power to create both nearly unlimited supply and nearly unlimited demand for these highly-addictive substances, the Manufacturing Defendants set out to create this new primary market. Each of the elements of the new primary market were selected to maximize sales of the highly addictive drugs. Manufacturing Defendants were the architects of the transition from a limited market pool of disease and injury (i.e., cancer, disorders requiring surgery, etc.) to widespread use to treat an ever-enlarging pool of common, non-life threatening maladies and conditions, such as arthritis, back pain, and joint pain. The universe of targeted patient conditions were vastly expanded by Manufacturing Defendants.

42. Manufacturing Defendants' successful promotion of highly addictive opioids for chronic, i.e., long-term conditions ensured that the newly targeted patient conditions would not result in one-time sales.

43. In order to maximize profits, the Manufacturing Defendants collectively had to convince physicians to expand treatment of their patients to include chronic and "non-malignant", i.e., non-cancer, pain. The Manufacturing Defendants engaged in this activity despite the fact that

they knew that the benefits of opioids are minimal in comparison to known risks, which are extreme, even fatal. To accomplish this increase in sales, the Defendants downplayed concern for addiction and encouraged increase dosages as a beneficial approach to pain management. They convinced the physicians to increase dosages without consideration of the addictive effects. However, prospective, randomized, controlled trials lasting at least 4 weeks that evaluated the use of opioids for chronic non-cancer-related pain showed only a negligible to modest improvement in pain-relief and no consistent improvement in physical functioning. The maximal adverse risks, however, included a "high incidence of opioid abuse behaviors" and "addiction."

44. Defendant Janssen, with other Manufacturing and Distributor Defendants, actively conspired to develop, grow, refine, produce, manufacture and market a new powerful variety of poppy which, in its refined form, became the active ingredient of a much more potent opioid. The Defendants knew and were fully aware that this new pharmaceutical ingredient increased the addictive properties of the drug.

45. Defendant J&J, through its subsidiaries, developed the Norman Poppy, a strain of the plant containing high levels of the compound Thebaine, which is a critical ingredient for the production of hydrocodone, hydromorphone, oxycodone, oxymorphone, nalbuphine, naltrexone, naloxone, and buprenorphine. Defendant J&J grew the Norman Poppy in Tasmania, Australia, and through its subsidiaries, sold active ingredients derived from these poppies for the manufacture of opioid drugs to other Manufacturing Defendants. Beginning in 1990 and continuing until at least 2016, Noramco and Tasmanian Alkaloids Limited, Defendant J&J's wholly owned subsidiaries, supplied opioid manufacturers with active ingredients derived from these poppies.

46. Upon information and belief, Defendant J&J's supplying of raw opioid ingredients enabled Manufacturing Defendants to meet the growing demand for powerful and dangerous opioid drugs formed in the wake of the pharmaceutical industry's misleading mass marketing of opioid drugs

to the medical community and directly to the public. By enabling the large-scale manufacture of these opioid drugs, Defendant J&J conspired to create an opioid epidemic, addicting millions of Americans to opioid drugs and significantly increasing instances of babies being exposed to opioids in utero.

47. Through the use of a highly coordinated, expensive, misleading, illegal, and callous manipulation of both the sales and distribution schemes for controlled substances within the United States, the Defendants expanded the market and flooded the country with highly addictive opiates.

48. To establish and exploit the lucrative market of chronic pain patients, Manufacturing Defendants developed a well-funded, sophisticated, and fraudulent marketing and distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties, to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other opioid Manufacturing Defendants. These statements were deceptive, false, and unfair. They were not supported by, and in fact, contrary to, the scientific evidence. These statements were also contrary to pronouncements by, and guidance from, the FDA and CDC based on that scientific evidence.

49. The Manufacturing Defendants spread their false, deceptive, and unfair statements by marketing their branded opioids directly to doctors and patients in the State of Kansas. In fact, they specifically targeted susceptible prescribers and vulnerable patient populations, including those in Kansas. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false, reckless, and/or negligent statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of Kansas.

50. The Manufacturing Defendants also entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated

treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Foundation ("APF"), American Academy of Pain ("AAP"), American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), U.S. Pain Foundation ("USPF"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

51. Patient advocacy organizations and professional societies like these play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.

52. The Manufacturing Defendants collaborated, through the aforementioned organizations and groups, to spread false, reckless, and/or negligent messages about the risks and benefits of long-term opioid therapy.

53. The Defendants also had systematic links to and personal relationships with each other through their participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities, including but not limited to, the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

54. The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The lobbyists for members of the PCF, including the Manufacturing Defendants, shaped federal and state policies regarding the use of prescription opioids for more than a decade.

55. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

56. Each of the Manufacturing Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.

57. In 2012, membership and participating organizations in the PCF included the HDA (of which all the Manufacturing Defendants are members), Endo, J&J (the parent company of Janssen Pharmaceuticals), and Teva (the parent company of Cephalon).

58. To convince doctors and patients in Kansas that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by misrepresenting the risks and benefits of long-term opioid use to those doctors and patients, these Defendants made claims that were not supported by, or were contrary to, the scientific evidence and that were contradicted by data.

59. To convince doctors and patients that opioids are safe, the Manufacturing Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, does not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

60. The Manufacturing Defendants falsely claimed that the risk of opioid addiction is low, and that addiction is unlikely to develop when opioids are prescribed (as opposed to obtained illicitly), and failed to disclose the greater risk of addiction with prolonged use of opioids.

61. The Manufacturing Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences

and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.

62. The Manufacturing Defendants in concert engaged in misleading marketing activities that resulted in a substantial increase in the supply of prescription opioids which made the drugs readily available for use by Baby Plaintiffs' biological mother and allowed her to potentiate her addiction.

63. As demonstrated by the allegations above, the Manufacturing Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent.

64. The Manufacturing Defendants' fraudulent, reckless, and negligent marketing scheme caused, and continues to cause, doctors in Kansas to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused, and continues to cause, patients to purchase and use opioids for their chronic pain, believing they are safe and effective. Absent these Defendants' negligent marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

65. The Manufacturing Defendants' fraudulent, reckless, and negligent marketing scheme has caused, and continues to cause, the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing exceeded

hundreds of millions of dollars per year.

66. The escalating number of opioid prescriptions written by doctors who were deceived by the Manufacturing Defendants' marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the United States and Kansas.

67. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse.

68. Contrary to the Manufacturing Defendants' misrepresentations, most opioid addiction begins with legitimately prescribed opioids and, therefore, could have been prevented had Defendants' representations to prescribers been truthful.

69. Moreover, at all times relevant to this Complaint, the Manufacturing Defendants took steps to avoid detection of, and to fraudulently conceal, their negligent marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturing Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like professional societies and "key opinion leaders" ("KOLs"). These Defendants purposefully hid behind the assumed credibility of these individuals and organizations, and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

70. The Manufacturing Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturing Defendants, such as Janssen, ran similar websites that masked their own direct role.

71. Finally, the Manufacturing Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

## DEFENDANTS UNLAWFULLY FLOODED THE MARKET WITH OPIOIDS

72. The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

73. Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became dependent.

74. Defendants, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably damaged, and continues to damage, those exposed to opioids in utero, including Baby Plaintiffs.

75. The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90% of all revenues from drug distribution in the United States – exceeding over $350 billion per year. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

76. Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

## COUNT I- PRODUCTS LIABILITY

77. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

78. Manufacturing Defendants are liable under Kansas Product Liability Act (K.S.A. 60-3301) for their design of unreasonably dangerous prescription opioids for which they failed to provide adequate safeguards to prevent foreseeable injuries.

79. Manufacturer and Distributor Defendants also had a statutory duty to warn, including giving timely and adequate warnings to the medical profession of any dangerous side effects produced by their drugs and to Plaintiffs and the public of the dangers associated with opioid use and to protect against those dangers.

80. Instead, Defendants withheld from and misrepresented to the FDA and members of the medical profession required information that was material to the use of their opioids. Specifically, Defendants misrepresented information about the addictive nature of the drugs, and they withheld data about the risks of fetal opioid exposure, including the association between opioid exposure in utero and birth defects.

81. In doing so, Defendants also violated their express and implied warranties that goods were merchantable, adequately labeled, and fit for ordinary use. Under K.S.A. 84-2-318, these warranties extend to third party beneficiaries, like Baby Plaintiffs, who may reasonably be expected to use, consume or be affected by the goods and who is injured in person by breach of the warranty.

82. Further, Defendants failed to warn consumers, including Tressa Jordan and her physicians, of those risks, and they failed to update the public about those risks as additional information became available to them by withholding and misrepresenting that information.

83. A reasonably prudent product seller could and would have taken additional precautions when selling their drugs to patients, including Plaintiffs and their mother.

84. Defendants are therefore liable to Plaintiff for their failure unreasonably dangerous drugs and their failure to warn Baby Plaintiffs' mother about the harmful effects of their products, which failure was a but-for cause of Baby Plaintiffs' injury.

85. Further, because Defendants' opioids are unreasonably defective and dangerous to Baby Plaintiffs and their mother, Defendants are strictly liable to Baby Plaintiffs.

## COUNT II- KANSAS CONSUMER PROTECTION ACT

86. Plaintiffs reassert the allegations of the foregoing paragraphs as if fully set forth herein.

87. The Kansas Consumer Protection Act Prohibits sellers from engaging in deceptive practices, in connection with a consumer transaction. Such practices include willful concealment, suppression or omission of a material fact; use of oral or written falsehood or ambiguity as to a material fact; or representations made with actual or constructive knowledge that the product has characteristics or benefits that it does not have.

88. Under K.S.A. 50-624(b), Tressa Jordan is a consumer who obtained opioid prescriptions for her personal use.

89. Defendants willfully concealed, suppressed or omitted the dangerous nature of their products, including the propensity for opioids to cause addiction and injury including NAS and long term health effects in children exposed in utero.

90. Defendants also knowingly used false and ambiguous oral and written material and representations, both directly and through their KOLs, to induce plaintiffs and their doctors to use

opioids for the treatment of long-term or chronic pain.

91. Under K.S.A. 50-627, Defendants were also prohibited from engaging in unconscionable acts and practices, including exploiting consumer's physical infirmity, ignorance, and inability to understand complicated pharmaceutical research; and making misleading statement of opinion on which the Plaintiff and others were likely to rely to their detriment.

92. Tressa Jordan and her doctor relied on these materials and representations made by Defendants and their KOLs when prescribing and using Defendants' opioids, and further, Defendants exploited the infirmity and ignorance of Tressa and other chronic pain suffers to their detriment.

93. But for Defendants' deceptive and unconscionable practices, Tressa would not have believed that Defendants' opioids were safe for long term use and for use during pregnancy, thus Defendants' violations of the Kansas Consumer Protection Act were thus a but-for cause of Baby Plaintiffs' injuries.

## COUNT III- NEGLIGENCE

94. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

95. By their applications to the Food and Drug Administration, the Defendants had the duty to investigate and fully disclose all the known consequences from the use of drugs each Manufacturing Defendant produced and to protect the consumers of the drugs from harm consistent with the legal standard of reasonable conduct under the circumstances in light of the risk involved.

96. Defendants' breach of their duty proximately caused the injuries and damages to Baby Plaintiffs.

97. Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts and omissions include:

a. Consciously supplying the market in Kansas with highly-addictive prescription opioids, including misrepresenting, understating, or obfuscating the highly addictive propensities of opioids;

b. Using deceptive and misleading marketing, labeling, distribution, and dispensing practices, including failing to provide adequate warnings of potential harm to pregnant women of child bearing age and their babies;

c. Affirmatively enhancing the risk of harm from prescription opioids by not protecting against diversion;

d. Failing to properly review and analyze prescription orders and data for red flags;

e. Failing to report suspicious orders or refusing to fill them;

f. Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

g. Failing to police the integrity of their supply chains;

h. Creating false and misleading information with the intention of having prescribing physicians rely upon it; and

i. Failing to disclose the foreseeable injuries to babies exposed to opioids in utero.

98. It is known that opioids are controlled substances and dangerous commodities that are highly addictive and potentially harmful. Each Defendant is required to take reasonable action to assess risk and reduce harm to individuals, including children exposed in utero. These Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their businesses.

99. Defendants owed a special duty to those individuals using their product including Baby Plaintiffs and their mother.

100. Baby Plaintiffs are without fault, and their injuries would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the manufacturing, distribution and dispensing of controlled substances.

**COUNT IV - CIVIL CONSPIRACY**

101. Plaintiff reasserts the allegations in the foregoing paragraphs as if fully set out herein.

102. It is well documented that the Defendants have acted in concert to mislead medical professionals, patients, the scientific community, the CDC, the FDA, the DEA, and the general public about the addictive nature of opioids and the risk of serious injury associated with in utero exposure to opioids for the sole purpose of creating a greater market through deception.

103. The Manufacturing Defendants continuously supplied prescription opioids to the Distributor Defendants despite having had knowledge that said Distributors were breaching their common law duties and the requirements of the Controlled Substances Act.

104. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having knowledge that the pharmacies were breaching their common law duties and the requirements of the Controlled Substances Act.

105. Each of the Defendants acted knowingly and in concert with each other with a common purpose to increase sales and maximize profit without regard to the grave harm it could and did cause to Baby Plaintiffs and others through their common efforts through deceptive advertising, marketing and lobbying.

106. At all relevant times, without concern for the truth, and for the sole purpose of expanding the market inappropriately, the Defendants manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised and promoted the use of prescription opioid drugs. The net result of this marketing was to flood the market with highly addictive, dangerous opioids. But for the Defendants' failure to comply with their legal obligations,

the secondary market for opioids could not have existed.

107. The conspiratorial acts or omissions described herein proximately caused the damages sustained by Baby Plaintiffs.

## PRAYER FOR RELIEF FOR COUNTS I AND II

**WHEREFORE**, Plaintiff Tressa Jordan, individually and as the mother and Legal Guardian of Baby Plaintiffs, requests that the Court grant compensatory damages for:

a. physical injuries and mental pain and suffering (past and future);

b. medical expenses (past and future), and all care medically necessary for Baby Plaintiffs' injuries;

c. loss of earning capacity;

d. physical and mental disability and impairment;

e. loss of enjoyment of life;

f. all other damages awardable at law or in equity; and

g. Reserves the right to seek amendment of the complaint to add punitive damages.

Further, Plaintiff demands Trial by Jury.

DATED: May 26, 2021

Respectfully submitted by:

***/s/Celeste Brustowicz***
COOPER LAW FIRM
Celeste Brustowicz
Stephen Wussow
1525 Religious Street
New Orleans, Louisiana 70130
Telephone: 504-399-0009
Facsimile: 504-309-6989
Email: cbrustowicz@clfnola.com
**TRIAL COUNSEL**

***/s/ Kent Harrison Robbins***
THE LAW OFFICES OF KENT

HARRISON ROBBINS, P.A.
Kent Harrison Robbins
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Email: khr@khrlawoffices.com
Secondary: ereyes@khrlawoffices.com
Tertiary: assistant@khrlawoffices.com
**TRIAL COUNSEL**

***/s/Jack W. Harang***
THE LAW OFFICE OF JACK W. HARANG
Jack W. Harang
2433 Taffy Drive
Kenner, Louisiana 700065
Telephone: 504-899-7949
Facsimile: 504-899-2518
Email: jwharang@gmail.com
**TRIAL COUNSEL**

***/s/Kevin Thompson***
THOMPSON BARNEY, PLLC
Kevin Thompson
2030 Kanawha Boulevard
East Charleston, West Virginia
Telephone: 304-343-4401
Email: kwthompsonwv@gmail.com
**TRIAL COUNSEL**

***/s/Donald Creadore***
CREADORE LAW FIRM
Donald E. Creadore
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone: 212-355-7200
Email: donald@creadorelawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th of May, 2021, a copy of the above and foregoing has been electronically filed with the Clerk of Court using the CM/ECF system, which provides an electronic service notification to all counsel of record registered as CM/ECF users.

***/s/Celeste Brustowicz***
COOPER LAW FIRM
Celeste Brustowicz